## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BERK UCAR, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 14-CV-765 (JCH) |
| v. | : | |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| TRANSPORTATION, ET AL., | : | AUGUST 11, 2016 |
| Defendants. | : | |

### RULING RE:  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 63)

## I.   INTRODUCTION

Berk Ucar ("Ucar") brings this action, principally under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"),  against the Connecticut Department of Transportation ("DOT"), James McCann ("McCann"), Rabih Barakat ("Barakat"), Jon Hagert ("Hagert"), and Scott Hill ("Hill").

Ucar alleges that the DOT subjected him to a hostile work environment, discriminated against him on the basis of his national origin and religion, and retaliated against him when he complained.  Amended Complaint ("Complaint") (Doc. No. 24) at 1-9; 10-11.[1]  He further claims that the DOT violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), that the individual defendants violated his constitutional rights under the Equal Protection Clause, U.S. Const. amend. XIV, and that McCann, Barakat, Hagert, and Hill intentionally inflicted emotion distress upon him.[2]  Complaint at 9-10; 13-14; 15-16.

---

[1] The Ruling will refer to page numbers, rather than paragraph numbers, when citing to the Complaint because the paragraph numbers are duplicative throughout.

[2] Ucar's claim that the DOT violated section 31-290a of the Connecticut General Statutes was dismissed in a previous ruling.  Ruling (Doc. No. 34).

The defendants have moved for summary judgment on all counts.  Defs.' Mot. for Summary J. ("Motion") (Doc. No. 63); see also Defs.' Memo. in Support ("Defendants' Memorandum") (Doc. No. 64-1).  Ucar has opposed the Motion.  Pl.'s Memo. in Opposition ("Opposition") (Doc. No. 74).

For the reasons set forth below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.   BACKGROUND

Berk Ucar was born in Turkey, moved to the United States in 2004, and became a United States citizen in 2009.  Pl.'s L. R. 56(a)2 Statement ("Plaintiff's Statement") (Doc. No. 75) ¶¶ 142-43.  Ucar is Muslim.  Defs.' L. R. 56(a)1 Statement ("Defendants' Statement") (Doc. No. 63-1) ¶ 1. Ucar has been employed as a civil engineer at the Connecticut Department of Transportation since March 2008.  Id.  ¶ 2.  He began work in the Bridge Design Unit ("BDU") of the DOT around January 2009, where he was first an Engineering Intern and was later promoted, after April 9, 2010, to Transportation Engineer 1.  Id. ¶¶ 5, 9.  The BDU works on projects involving the rehabilitation and replacement of bridges in the state of Connecticut.  Id. ¶ 6.  As part of his work at the BDU, Ucar reviewed drawings, prepared design plans, and quantified the amount of supplies necessary for a given project.  Id.

The events giving rise to Ucar's Complaint may be divided into five principal occurrences.  The first consists of allegedly abusive behavior on the part of his direct supervisor at the BDU in 2010.  Opposition at 1.  The second concerns a car accident Ucar was involved in during work hours in 2012.  See Defendants' Statement ¶¶ 23-41. The third consists of Ucar's allegation that a DOT investigation into Ucar's use of the

DOT gym during work hours was motivated by discrimination.  Id. ¶¶ 42-94.  The fourth

concerns an investigation into whether Ucar had bullied his co-workers.  Id. 124.  The

fifth involves the service of a negative performance appraisal on Ucar on August 30,

2013.

     A.    Difficulties with James McCann

     Defendant James McCann was Ucar's supervisor when he first transferred to the

BDU.  Id. ¶ 7.  At some point in 2010, Ucar and McCann's relationship deteriorated:

McCann called Ucar a "thief" and a "cheater" for taking medical leave to attend doctor's

appointments, id. ¶ 13, and ultimately convened a meeting with Ucar, along with

defendant Jon Hagert and another supervisor, to discuss Ucar's work attendance,

performance, and "general attitude toward his supervisors."  Id. ¶ 10.[3]  Ucar also alleges

that McCann "yelled at [him] saying that [his] work performance [was] so poor in front of

all of the employees," Dep. of Berk Ucar ("Ucar Deposition") (Doc. No. 63-3) at 35:7-9,

and that McCann "mocked [him]" because English was not his first language, id. at

35:16-18.

     Ucar claims that the "thief" and "cheater" comments were motivated by religious

and jingoistic animus toward Ucar's Turkish ancestry and adherence to Islam.

Opposition at 1-2 (using McCann's comments as an illustration of how "[t]he

discriminatory treatment began in 2010").  Other than the following exchange in Ucar's

deposition, the court is unaware of evidence supporting this assertion.

     Q.    Did he say that you were a thief and cheater because
               you are from Turkey?

---

    [3] Ucar does not dispute that this counseling session occurred, but claims that it is irrelevant.
Plaintiff's Statement ¶ 10.  The court does not consider it irrelevant, as it illustrates ongoing difficulties
between Ucar and his supervisors.

A.     He says because I'm a thief—he said that I am a thief and cheater because I took some doctor appoint-ments, and I don't see that he says that to other em-ployees.  Why was I the one picked?  I feel it's be-cause of my national origin.

Q.     You feel that, but he never said you're a thief and cheater because you are from Turkey?

A.     Because I took some doctor's appointment.

Q.     Not because you are from Turkey?

A.     Because I took some doctor's appointment.

Q.     Not because you are from Turkey?

A.     Because I took some doctor's appointment because of my national origin.

Q.     He said that, he said that because of your national origin?

A.     He didn't say that.

Dep. of Berk Ucar ("Ucar Deposition") (Doc. No. 63-3) at 35:25-36:15.

These episodes with McCann precipitated what Ucar contends are several psychological and emotional issues that would continue throughout his employment at the DOT.  Specifically, Ucar alleges that he suffered depression, anxiety, and later (presumably as a result of the events described at greater length below), post-traumatic stress disorder.  Plaintiff's Statement ¶¶ 156-162.

B.     The Car Accident

On September 7, 2012, Ucar was involved in a car accident while a passenger in a state-owned car.  Defs.' Statement ¶ 23.  Though the police report of the accident stated that Ucar was uninjured and Ucar did not go to the hospital immediately following the accident, id. ¶ 24-25, Ucar claims that he was injured in the accident and told McCann and Hagert about pain he was suffering in his back and neck shortly after the

4

accident.  Ucar Deposition at 61:17-23; see also Minutes of Fact Finding 12/18/2012
(Doc. No. 75-5) at 6 (McCann stating that, on September 7, 2012, Ucar told him that his
back was "tight").  Not until December was Ucar's supervisor, McCann, notified of
Ucar's desire to file a Workers' Compensation claim, see McCann Deposition (Doc. No.
63-10) at 58:3-6, and Ucar did not seek medical attention exclusively concerning the
tightness in his back and neck until December 6, 2012, see Defendants' Statement
¶ 30.[4]  As will be discussed at further length below, Ucar was notified that he was under
investigation for using the gym during work hours between December 5 and 7, 2012.
Plaintiff's Statement ¶ 31.

      C.     Investigation into Ucar's Use of the DOT Gym

      Beginning in late 2012, Ucar was the subject of an investigation, commenced by
his supervisors, into his use of the gym located in the DOT building, which they believed
Ucar used during work hours.  The investigation was triggered by Bob Zaffetti, a
manager of the Bridge Safety and Evaluation Unit, who reported to Ucar's supervisor,
Rabih Barakat, that he had seen Ucar at the gym on a consistent basis between roughly
7:00 and 7:30 a.m. for the better part of two months.[5]  Defendants' Statement ¶ 42.  As
a member of the P-4, Engineering & Scientific Employees Union ("P-4"), Ucar was given

---

[4] Ucar claims these two facts are in dispute.  Plaintiff's Statement ¶¶ 39, 30.  As stated here, they
are not.  Ucar does not dispute McCann's unequivocal assertion that Human Resources did not notify him
of Ucar's desire to file a Workers' Compensation claim until three months after the accident; rather, Ucar
claims that he had told Human Resources of his desire to file such a claim earlier.  Id. ¶ 39.  These two
assertions are not inconsistent.  Further, though Ucar claims that he had discussed pain in his back and
neck to physicians on unrelated visits before December 6, 2012, he does not dispute that his December 6
appointment was the first appointment expressly concerning such pain.  Id. ¶ 30.

[5] Though Defendants' Statement refers to the time period as "7:10 – 7:30 a.m.," Defendants'
Statement ¶ 42, Barakat in fact stated in his deposition that the timeframe was "around between seven
and 7:30, something around there."  Barakat's Deposition (Doc. No. 75-2) at 26:4.  Elsewhere in the
record, however, Barakat claims to have been told of a 7:10 to 7:30 a.m. timeframe.  See Fact-finding
(Doc. No. 63-4) at 80.

the choice of when to start his workdays.  Id. ¶ 44.  Since 2009, he has maintained a

work schedule of 7:00 a.m. to 3:30 p.m. for five day workweeks, and from 7:00 a.m. to

4:00 p.m. for four day workweeks.  Id. ¶¶ 47-49.  Ucar did not have permission to use

the gym during work hours.  Id. ¶ 53; see also id. ¶ 76.

Because Ucar's direct supervisor, McCann, did not start his workday until 8:00

a.m., Barakat asked Mei Wong ("Wong"), a Transportation Engineer 3 in the BDU who

started her workday at 7:00 a.m., to document the time that Ucar arrived at his work

station in the morning, and to note any times Ucar left and returned to his desk.  Id. ¶

55; 58-59.  Wong maintained a log of his comings and goings from the BDU for four

days.  Id. ¶ 62.  She did not follow him and was unaware of where he was when he was

not at is desk.  Id.  During those four days, Wong observed and recorded that Ucar was

away from his desk for a total of one hour and eighteen minutes between 7:05 and 8:28

a.m. on November 26, 2012, and forty-eight minutes between 7:06 and 7:58 a.m. on

November 27, 2012.  Id. ¶¶ 63-64.

On the latter date, November 27, Hagert observed that Ucar was away from his

desk and asked Wong whether he had been to the desk before and later left.  Hagert

Deposition (Doc. No. 75-3) at 34:7-35:12.  She confirmed that he had.  Id.  Hagert,

whom Barakat had instructed to check to see if Ucar was at the gym if he was not at his

desk, accordingly went to the gym and claims to have observed Ucar doing push-ups

there.  Id.  He reported his observation to Barakat but did not recommend any particular

action.  Id.

In early December, Ucar was notified that a fact-finding meeting was scheduled

for later that month to investigate his use of the gym during work hours.  See

6

Defendants' Statement ¶ 31.  The parties are in dispute about precisely when Ucar

received notice of this fact-finding meeting: though there are two notices (one dated

December 5 and another dated December 6), Ucar claims that he did not become

aware of those notices until December 7, one day <u>after</u> his first doctor's appointment

exclusively concerned with his back and neck pain.  <u>Compare</u> <u>id.</u> with Plaintiff's

Statement ¶ 31.

On December 18, 2012, a fact-finding meeting was held.  At that meeting,

several employees, including defendant Hagart, testified that they had seen Ucar using

the gym during work hours.  Defendants' Statement ¶¶ 67-69.  A second fact-finding

meeting was held on February 13, 2013, at which another employee provided a

statement that he had seen Ucar using the gym during work hours in late November.

<u>Id.</u> ¶¶ 70; 72.  Wong did not testify at either fact-finding meeting.  <u>Id.</u> ¶ 71.

Based on the testimony heard at both fact-finding meetings, Barakat concluded

that Ucar had used the gym during his work hours, in violation of DOT policy.  <u>Id.</u> ¶ 74.

In March 2013, Barakat forwarded his findings to the Human Resources department,

and on March 18, 2013, Wanda Seldon recommended suspending Ucar for 60 days.

<u>Id.</u> ¶ 75.  Barakat, McCann, and Hagert did not participate in the decision to recommend

a 60 day sanction.  <u>Id.</u> ¶ 77.  Human Resources sent notice of the recommended

sanction and of a pre-disciplinary <u>Loudermill</u> hearing[6] to Ucar on March 27, 2013.  The

<u>Loudermill</u> hearing was scheduled for April 27, 2013.  <u>Id.</u> ¶ 78.  Human Resources sent

a second notice advising Ucar of a change of date, setting the <u>Loudermill</u> hearing for

April 23, 2013.  <u>Id.</u> ¶ 79.

_____

[6] <u>See</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 543 (1985) (public employees entitled
to notice and a hearing before employment sanctions).

On April 23, 2013, Ucar attended the <u>Loudermill</u> hearing and on that same day filed a formal complaint with the DOT, alleging that he had been discriminated against in the course of the gym use investigation.  <u>Id.</u> ¶¶ 80-81.  That complaint was ultimately dismissed.  <u>Id.</u> ¶ 81.  On August 30, 2013, DOT notified Ucar that he was suspended for five days for his use of gym time during work hours, and particularly while charging his time to federal projects.  <u>Id.</u> ¶ 82.  Ucar's appeal of this determination remains pending. <u>Id.</u> ¶ 83.

The record does not reflect that any comments were made during the course of this first investigation related to Ucar's religion or national origin.  Ucar has claimed that American-born, non-Muslim co-workers were permitted to leave their desks to take cigarette breaks and the like, without recording the time off on his or her timesheet and without being penalized in the manner that Ucar was for using the gym.  Thought he was unable to identify any such employee specifically at his deposition, <u>id.</u> ¶ 94, Ucar has since submitted several affidavits from DOT employees who have indicated that DOT employees are permitted to take longer breaks than are provided by their contract, for example, to get water or coffee, make a call, smoke a cigarette, or got for a walk outside.  Plaintiff's Statement ¶ 94.  Ucar maintains that he never used the gym to work out during work hours, but only used the gym to get water from the gym water cooler, as he does not like the water fountains at his office.  Ucar Affidavit (Doc. No. 76) ¶¶ 32-33.

D.   <u>Bullying Investigation</u>

A separate investigation into Ucar's conduct commenced during, and in part as an outgrowth of, the gym use investigation.  When he was first served with notice of the <u>Loudermill</u> hearing on March 27, 2013, Ucar posted it on his workstation, making it

visible to his co-workers, in particular Wong, Hagert, and McCann, all of whom were involved in the gym use investigation. Id. ¶¶ 95-96; 99. Though he was advised by his union representative, at the recommendation of Human Resources, that it was inappropriate to put his Loudermill notice on his wall, Ucar refused to take it down. Id. ¶¶ 96-98.

On April 25, 2013, Wong, McCann, and Hagert approached Barakat "about feeling uncomfortable and/or creepy concerning Ucar." Bullying Fact-finding (Doc. No. 75-13). This was two days after Ucar filed his complaint claiming Wong, McCann, Hagert, Barakat, and Hill among others, had discriminated against him. Ucar Affidavit (Doc. No. 76) ¶ 40. It is not clear from the record whether these witnesses were, at the time they approached Barakat, aware that a complaint had been lodged against them. See, e.g., Affirmative Action Unit Statement Form (Doc. No. 63-4) at 1 (indicating that the April 23, 2013, complaint was not referred to Human Resources until April 29, 2013) and McCann Deposition (Doc. No. 75-1) at 98:13-21 (McCann first became aware of his being named in the complaint when he was requested to attend a meeting concerning the complaint; there is no evidence to support the proposition that McCann was requested to attend a meeting about the complaint before HR became aware of it on April 29, 2013).

Wong, McCann, and Hagert all expressed various degrees of concern about Ucar's behavior toward them following the gym use investigation. Specifically, McCann stated that he was bothered that Ucar had posted his Loudermill notice on his wall and had observed Ucar's personality change for the worse: that he was smirking around the office and engaged his co-workers in short, negative conversation. Defendants'

Statement ¶ 100.  Wong said that she was uncomfortable and was scared by Ucar's behavior.  Id. ¶ 101.  In one instance, Wong claimed that Ucar had walked down the hallway in such a way that he forced her to move to the side of the hallway to avoid physical contact with him.  Id.  Hagert, for his part, believed Ucar was "shooting him menacing glares, squinting his eyes and staring him down in the hallways," all behavior he considered "threatening."  Id. ¶ 102-103.

On April 29, 2013, defendant Scott Hill, the Manager of Bridges and Facilities, ordered Ucar to relocate his work station to a different area of the office and to report directly to Barakat, whose office would be right next to his.  Id. ¶ 105.  Ucar's co-workers were advised of the change by e-mail.  Id. ¶ 109.  Though Ucar maintained his job title, salary, and benefits, he was instructed to minimize contact with the BDU and, Ucar claims, that he was told not to communicate with members of the Unit.  Ucar Affidavit ¶ 43 (claiming that he was told not to communicate with BDU employees); but see Ucar Deposition (Doc. No. 75-4) at 153:12-13 (indicating only that he was told to avoid the BDU).  Though Hill claims that Ucar began interacting with the BDU again "[a]s time passed," Defendants' Statement ¶ 113, Ucar claims that he was categorically denied access to the BDU until January 9, 2014, and was only moved back to the BDU on January 21, 2014.  Plaintiff's Statement ¶¶ 113.  The parties also dispute how populous Ucar's new office space was: the defendants claim that "[plaintiff's new work station . . . was populated with a similar number of employees compared to his former work station," Defendants' Statement ¶ 107, while Ucar claims that, where his old office had as many as thirty co-workers, his new office only had three.  Plaintiff's Statement ¶ 107.

On May 14, 2013, two DOT employees conducted a fact-finding meeting concerning the allegations that Ucar had bullied his co-workers. Defendants' Statement ¶ 114. During this fact-finding, the first and only evidence of statements related to Ucar's national origin or religion were made. Specifically, Hill, Barakat, and Hagert referred to the Boston Marathon bombings, which occurred on April 15, 2013, in explaining why Barakat was approached by Ucar's co-workers about his behavior. See id. ¶¶ 120-23. Hagert testified that he checked his car after work to make sure Ucar had not placed a bomb under it, and even asked Hill to search Ucar's backpack and inspect its contents. Plaintiffs' Statement ¶ 119 (citing, inter alia, Hagert Deposition (Doc. No. 75-3) at 77:9-22.

Ultimately no action was taken as a result of the fact-finding. Bullying Fact-finding (Doc. No. 75-13) at 3. Specifically, it was concluded that:

> [t]he behaviors of Berk Ucar that were discussed were not returning pleasantries, "cold stares," false smiles, "evil stare." However, many stated that they had not experienced a verbal or physical threat. Although the above behaviors may be uncomfortable, they are not unreasonable considering that Mr. Ucar was notified that he was facing a significant suspension for the previous Fact Finding.

Id. The record is not clear when this finding was made. As mentioned above, supra at 10, Ucar moved back to the BDU on January 21, 2014.

E.    The Performance Appraisal

On August 30, 2013, Barakat, Hagert, and McCann attempted to give Ucar a performance evaluation after his work hours had ended and in the absence of union representation. Defendants' Statement ¶¶ 125-26; Plaintiff's Statement ¶ 126. According to Ucar, Hill demanded Ucar to come to Hill's office and stay to receive the

performance appraisal in the presence of his other supervisors, Barakat and McCann. Id. ¶¶ 127-129; Defendants' Statement ¶¶ 127-129.  Hill offered Ucar overtime pay to stay and receive the appraisal, but Ucar declined.  Id. ¶ 131.  When Hill offered to mail him the performance appraisal, Ucar refused to provide his mailing address, directing Hill to Human Resources.  Id. ¶ 132; Plaintiff's Statement ¶ 132.  Ucar claims that Hill yelled at him, telling him that he "would make [Ucar] pay," and that Ucar "would regret this."  Plaintiff's Statement ¶ 133.

Ucar claims a co-worker extricated him from this situation, escorting him from the building.  Id.  Ucar then called the police, claiming that he had been threatened by Hill. Id.; Defendants' Statement ¶ 133.

The performance appraisal was ultimately served on Ucar on September 12, 2013.  Id. ¶ 135.  The appraisal was negative, indicating regression in job element categories concerning quantity and quality of work, ability to learn new duties, initiative, and judgment.  Id. ¶ 136.  At the request of Ucar's union representative, the DOT agreed to remove certain comments on the evaluation related to sick leave usage and medical appointments.  Id. ¶ 135.

On September 12, 2014, DOT issued a satisfactory performance appraisal, in which it was indicated that Ucar had improved in nearly all job elements.  Id. ¶ 141. However, Ucar has repeatedly applied for promotions at the DOT, the applications for which include the unsatisfactory 2012-2013 performance review, and been rejected eight times, mostly recently in November 2015.  Plaintiff's Statement ¶ 163.

### III.    STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." Id. In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir. 2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The Second Circuit has recently reiterated that, although summary judgment is proper in employment discrimination cases "where there is nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony . . . there is a need for caution about granting summary judgment to an employer in a discrimination case where the merits turn on a dispute as to the employer's intent." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 843 (2d Cir. 2013) (internal quotation marks, citations, and modifications omitted).

## IV.   DISCUSSION

Before the court addresses the three claims at the heart of Ucar's Complaint—hostile work environment, disparate treatment, and retaliation—the court first addresses several preliminary matters.

The DOT has moved for summary judgment as to Ucar's claim under the ADA on the ground that it is not amenable to suit under that Act due to the the Eleventh Amendment.  Defendants' Memorandum at 3-6.  Ucar concedes that, as pleaded, his Complaint must fail as to his ADA claim for this reason, but asks the court to grant him leave to amend the Complaint to assert a claim for prospective equitable relief under the ADA against the DOT Commissioner, James P. Redeker.  Opposition at 14-16.  In support of his request to amend his Complaint, Ucar relies principally on Mary Jo C. v. N.Y. State & Local Retirement Sys., 707 F.3d 144, 166 (2d Cir. 2013), in which the Second Circuit reversed a judgment granting the defendant's motion to dismiss, with instructions to allow the plaintiff to amend her complaint to attempt to invoke the doctrine of Ex Parte Young, 209 U.S. 123 (1908).

     Mary Jo C. is distinguishable on its face because it granted leave to amend the plaintiff's complaint at the motion to dismiss stage, not the summary judgment stage, as is the case here.  See August v. Dep't of Corrections, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (generally, a plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment"); see also G.L.M. Sec. & Sound, Inc. v. LoJack Corp., — Fed. App'x —, 2016 WL 3854432 (Mem.) at *2 (2d Cir. July 12, 2016) (quoting Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2d Cir. 1988) ("[A] proposed amendment is especially prejudicial when discovery has already been completed and [the] non-movant had already filed a motion for summary judgment."))  The court is not inclined to add a party to this dispute at this late stage in the case and would deny any motion for leave to amend the Complaint.  Id.  On this basis alone, the defendants' Motion is granted as to the ADA count, as the Eleventh Amendment precludes Ucar's claim against the DOT.

     Even assuming such leave to amend were granted, however, the amendment would be futile.  There are four elements to a discrimination claim under the ADA, as is alleged in Ucar's Complaint at 10-11: (1) the employer is subject to the ADA, (2) the individual suffers from a disability as defined by the ADA, (3) the individual is otherwise qualified to perform the tasks required of the job, and (4) the individual suffered an adverse employment action as a result of his disability.  Ryan v. Grae & Rybicki, P.C., 135 F. 3d 867, 869 (2d Cir. 1998).  Though the Complaint alleges that Ucar "has been continually harassed on the basis of his disabilities and because of the defendant, through its agents, servants and/or employees' perception of the plaintiff as having various physical and/or mental disabilities," the record does not appear to contain any

evidence upon which a reasonable juror could find that any discriminatory treatment against Ucar, assuming there was any, was the result of a disability, whether genuine or perceived by his employer.[7]  Consequently, the court grants the defendants' Motion as to Ucar's claim under the ADA.

The defendants have also pointed out that Ucar's Complaint alleges a 60-day suspension as the required "adverse employment action" for purposes of his disparate treatment claim.  Defendants' Memorandum at 18-20.  As Ucar concedes, a proposed suspension cannot constitute an "averse employment action," and asks the court to construe his Complaint as having pled the actually-imposed 5-day suspension as the relevant adverse employment action.  Opposition at 22-23; 25-26.  The Complaint does, in fact, reference the 5-day suspension in the Fourth Count, which alleges retaliation. Complaint at 11.

The court will construe the Complaint has having alleged the 5-day suspension as the requisite adverse employment action across the entirety of the Complaint.  The federal pleading rules are designed to put the defendant on notice of the "factual basis for the complaint," Johnson v. City of Shelby, 135 S. Ct. 346 (2014) (per curiam).  The parties are in agreement that, although the DOT initially proposed a 60-day suspension,

---

[7] Citing to Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 766 F.2d 715, 722-23 (2d Cir. 1985), the defendants also contend that, because only injunctive relief would be available under Ex parte Young were plaintiff to amend his Complaint, the amendment would be futile.  In Am. Postal Workers Union, the Second Circuit held that a preliminary injunction could only issue with respect to a matter related to ongoing arbitration if that injunction would "aid arbitration."  Id.  The equitable relief sought here—"removal of all unfounded and baseless discipline discriminatory imposed upon the plaintiff and presently existing in his personnel file," Complaint at 16—is already the subject of ongoing arbitration, pursuant to Ucar's union contract.  Defendants' Statement ¶ 83.  Thus, the defendants argue, injunctive relief in this case is inappropriate (assuming, again, that leave to amend were granted), insofar as it is unnecessary to aid in Ucar's ongoing arbitration.

The court need not reach this argument in light of the above conclusions on the Eleventh Amendment and the lack of evidence produced by Ucar that could create a genuine issue of material fact as to his ADA claim.

it ultimately imposed a 5-day suspension, and that suspension was elsewhere pled on the face of the Complaint.  The DOT was on notice of what disciplinary action was at issue here.  Consequently, the court will construe the Complaint as having alleged a 5-day suspension with respect to the disparate treatment claim, as well as the retaliation claim.

    A.    <u>Hostile Work Environment</u>

Upon review of the facts, Ucar's allegations, taken in their most favorable light, fail to raise genuine issues of material fact sufficient to permit his hostile work environment claim to be put before a jury.  Consequently, summary judgment is entered in the defendants' favor.

To assert a claim for hostile work environment in violation of Title VII of the Civil Rights Act, a plaintiff must establish: (1) that his workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive as to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer.  <u>Alfano v. Costello</u>, 294 F.3d 365, 373-74 (2d Cir. 2002).  As the Second Circuit has explained, "[t]his test has both objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must also subjective perceive that environment to be abusive."  <u>Id.</u> (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)).  "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.  Isolated acts, unless very serious, do

not meet the threshold of severity or pervasiveness."  Tolbert v. Smith, 790 F.3d 427,

439 (2d Cir. 2015) (internal quotation marks and citations omitted).

The facts adduced in discovery and presented to the court with respect to the

instant Motion are that McCann, in 2010, said a number of rude and unprofessional

things to Ucar concerning his competence at English and his decision to take sick leave

to see a physician;[8] that a 5-day suspension was imposed on Ucar because he was

found to have used the gym during work hours; that his desk was moved to another

area of the office in response to several complaints made by Ucar's co-workers that he

was acting unprofessionally toward them, and that at a related fact-finding hearing

several of Ucar's co-workers suggested that they were concerned that Ucar was a

terrorist in light of the Boston Marathon bombings; and, finally, that Ucar's supervisors

served a performance review on him in an arguably hostile and inappropriate manner.

Of these facts, only one involves his co-workers saying or doing anything that

may readily be construed as related to his national origin or religion—the altogether

inappropriate and narrow-minded suggestion, during the bully fact-finding meeting, that

Ucar, as a Muslim of non-white descent, was at all similar to the perpetrators of the

Boston Marathon bombing.  However, the Supreme Court has been clear that "a

---

[8] The court also agrees with the defendants that the 2010 McCann incidents are out of time.  See Defendants' Memorandum at 7-11.  Title VII requires that a worker file a charge of discrimination within 180 or 300 days of his employer's discriminatory act.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002).  For hostile work environment claims, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. at 117.  However, "if an act on day 401 had no relation to the acts between days 1-100 . . . then the employer cannot recover for the previous acts, at least not by reference to the day 401 act."  Id. at 118.

Ucar filed his complaint at the Equal Employment Opportunities Commission on June 14, 2013; three hundred days prior to that date is August 18, 2012.  McCann's allegedly discriminatory behavior occurred in 2010.  There is no evidence that it bears any relation to the later alleged acts of discrimination on the part of Ucar's other co-workers in 2012 and 2013, as described below.  Consequently, McCann's behavior is the "day 401 act" contemplated by the Supreme Court in Morgan, and Ucar may not use evidence of these events to support his hostile work environment claim.

recurring point in [the law of hostile work environment under Title VII] is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam) (internal alterations and quotations omitted) (quoting Faragher v. Boca Raton, 524 U.S. 775, 788 (1998)).

Ucar cites to Ashraf-Hassan v. Embassy of France, 999 F. Supp. 2d 106 (D.D.C. 2013), in support of his assertion that he has put forward sufficient evidence upon which a jury could find that Ucar was subjected to a hostile work environment. Plaintiff's Opposition at 13. This case, however, illustrates that Ucar's evidence is, on the contrary, insufficient. In that case, the plaintiff was subjected to harassment "on a regular basis," Ashraf-Hassan, 999 F. Supp. 2d at 113, whereby she was

> frequently informed of meetings after they had begun, was required to fulfill other employee's responsibilities while they were on vacation or lunch, was denied vacation days even though she had vacation days left, and was not welcome at events or annual meetings that all other employees attend-ed. . . . By the end of her employment she was without a phone, computer, or office and had to ask [her supervisor's] permission each day before settling in the smaller intern of-fice and would wait in front of his office to enter the intern room."

Id. at 113-14 (internal quotation marks and citations omitted). As a backdrop to all of this, her supervisor

> referred to [the plaintiff, a Muslim,] multiple times as "the Pashtoun," an ethnic slur that she believes equated her with the Taliban. In addition, when a co-worker commented "now we hire terrorists," based on [the plaintiff]'s presence in the office, her supervisor . . . actively affirmed the sentiment. When terrorists were captured in the United States, [her su-pervisor] waved a newspaper and claimed [the plaintiff]'s

> "people had done it again."  And, of course, [the plaintiff]
> claims that [another supervisor] referred to her and her chil-
> dren as "dogs." . . . Add to the mix [her other supervisor]'s
> lecture on why [the plaintiff] "should not have her baby" and
> should have used "condoms" or "pills," and you have dis-
> criminatory conduct that is both severe and offensive.

Id. at 114 (internal quotation marks and citations omitted).  The evidence in this case

simply is not as severe or pervasive as that put forward by the plaintiff in Ashraf-

Hassan.[9]

    In a case more similar to the one presently before the court, the Southern District

of New York held in Payano v. Fordham Tremont CMHC, 287 F. Supp. 2d 470, 476

(S.D.N.Y. 2003) that:

> Payano's racial harassment allegations are likewise insuffi-
> cient.  In the approximately one month between September
> 11, 2001 and Payano's termination in October, Payano al-
> leges that [his co-workers] 'constantly' commented and
> 'joked' that Payano looked like an Arab terrorist.  If true,
> these comments are reprehensible, but, for the same rea-
> sons explained above in connection with Payano's sexual
> harassment allegations, his charge of racial discrimination
> fails to rise to the level required to demonstrate a hostile
> work environment.

Id.  A similar conclusion must be drawn here.  Ucar's co-workers apparently indulged

fears and prejudices that can only be described as reprehensible.  However, these

actions do not arise to a cause of action for hostile work environment under Title VII.

---

[9] The same can be said for another case on which Ucar relies.  In Edrisse v. Marriot Int'l Inc., 757 F. Supp. 2d 381, 387 (S.D.N.Y. 2010), the court held that genuine issues of material fact existed on the plaintiff's hostile work environment claim where there was evidence "that [the Muslim plaintiff's supervisor] repeatedly mocked the appearance of Muslim women by draping a napkin across his face, referred to plaintiff as a terrorist and intimated that plaintiff would blow up the Marquis building."  Id.  Ucar's case is particularly distinguishable by the fact that the only instances of any reference to his religion or national origin were by implication on a single occasion, at the bullying fact-finding, whereas in Edrisse (and Ashraf-Hassan), the religious-based commentary was repeated over a period of time.

B.    Disparate Treatment

Disparate treatment claims made under Title VII are analyzed under the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that test, a plaintiff must establish a prima facie case of discrimination by showing that "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted).  After a prima facie case has been made, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [action]." Estate of Hamilton v. City of New York, 627 F.3d 50, 55 (2d Cir. 2010) (internal quotation marks and citations omitted).  If the employer articulates such a reason, the plaintiff "is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation."  Vivenzio v. City of Syracuse, 611 F. 3d 98, 106 (2d Cir. 2010).  At this last stage, the plaintiff must show "both that the [proffered, nondiscriminatory reason] was false, and that discrimination was the real reason" for the adverse employment action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original) (quoted in Roncallo v. Sikorsky Aircraft, 447 F. App'x 243, 245 (2011) (summary order)).

Ucar has come forward with evidence sufficient to show the first three steps of his prima facie case: the evidence before the court is sufficient for a reasonable juror to find that Ucar was a member of a protected class, was qualified for his position at the

DOT, and that he suffered an adverse employment action—at least with respect to his 5-day suspension and negative 2012-2013 performance review, which likely has affected his ability to obtain a promotion.  See, e.g., St. Juste v. Metro Plus Health Plan, 8 F. Supp. 3d 287, 306 (E.D.N.Y. 2014) (suspension without pay is adverse action) (collecting cases); Farina v. Branford Bd. of Educ., 458 F. App'x 13, 17 (2d Cir. 2011) (negative evaluation letters may be adverse employment actions if they have an effect on the terms and conditions of employment).

To prove an inference of discrimination at the prima facie case stage, a plaintiff may seek to show "that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group."  Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citations omitted).  Though "[o]rdinarily the question whether two employees are similarly situated is a question of fact for the jury[,]" id., a court "can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  Harlen Assocs. v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001).  "Conclusory statements to the effect that similarly situated employees outside of the plaintiff's protected class were treated more favorably than the plaintiff have been held insufficient to defeat summary judgment."  Graham v. Elmira City School Dist., No. 6:10-CV-6645T, 2015 WL 1383657, at *5 (W.D.N.Y. Mar. 25, 2015).

Ucar has marshalled evidence upon which a reasonable juror could conclude that these adverse employment actions were taken "under circumstances giving rise to an inference of discriminatory intent."  Mathirampuzha, 548 F.3d at 78.  Ucar relies principally upon a number of individuals as "similarly situated employees," against

whom no adverse action was taken.  These employees, Ucar alleges, were permitted to take additional breaks during work time to, for example, smoke cigarettes or go for a walk.  See, e.g., Plaintiff's Statement ¶ 94.  The defendants observe that Ucar fails to allege any co-workers who used the gym and further notes that the similarly situated employees Ucar alleges as the basis of his disparate treatment claim are not a part of his work unit, and several are not in his chain of command.  Defendants' Statement ¶¶ 86-94.  However, the court is persuaded that a reasonable juror could conclude, despite this, that the comparitors are materially similar to Ucar insofar as they are union employees of DOT, and were essentially permitted to take short breaks of the kind Ucar claims he took.  For example, Ucar submits an affidavit of his P-4 union representative indicating that, as a general matter, DOT workers often take breaks during work for a cigarette or to go for a brief walk.  Affidavit of Timothy McGuane (Doc. No. 77) ¶¶ 16-17.  In this case, a reasonable juror could conclude that the comparitors Ucar has put forward are materially similar to Ucar.  Consequently, a genuine issue of material fact exists at this stage of Ucar's prima facie case.

Moreover, Ucar has presented evidence upon which a reasonable juror could conclude that the defendants' proffered legitimate, non-discriminatory reasons for the adverse employment action are false.  Specifically, the defendants have argued that the adverse employment actions at issue—the 5-day suspension and the unfavorable performance evaluation—were the result, not of discrimination, but rather the factual determination on the part of Ucar's supervisors that he was using the gym during work hours.  See generally Defendants' Memorandum 23-25.  Based upon the evidence put forward here, a reasonable juror could conclude "both that th[is] proffered reason was

false <u>and</u> that discrimination was the real reason," <u>Hicks</u>, 509 U.S. at 515.  First, Ucar has asserted that, rather than using the gym to work out, he was merely getting water and not using the gym.  Second, there exists evidence in the record upon which a reasonable juror could conclude that the investigation, and its factual finding (based on the testimony of several witnesses to his use of the gym) was motivated by his membership in a protected class.  For example, several of the individuals who prompted and carried out the gym investigation would later go on to prompt a related investigation that was apparently instigated by openly-expressed prejudices against Ucar on the basis of his religion and national origin.  <u>See</u> <u>supra</u> at 8-11 (describing bullying investigation).  That, combined with the fact that the evidence could be construed to suggest that Ucar was singled out for taking time to get water, could serve as a reasonable, evidentiary basis for a reasonable juror to return a verdict in Ucar's favor.

The court notes that it has conducted the analysis so far with respect to Ucar's case of disparate treatment as to his 5-day suspension and negative evaluation, which was based in considerable part on the conclusion of the gym use investigation and resulting sanction.  <u>See</u> <u>infra</u> at 30-31.  The court has omitted reference to Ucar's desk having been moved from one area of the office to another because the court is unpersuaded that this action was a "materially adverse change in the terms and conditions of employment," <u>Mathirampuzha</u>, 548 F.3d at 78 n.7, as is required for Ucar's <u>prima</u> <u>facie</u> case.  There are genuine disputes as to how many co-workers with whom Ucar was surrounded in his second workstation, and whether Ucar was forbidden to communicate with his co-workers at his original workstation, <u>compare</u> Defendants' Statement ¶¶ 107; 112-13 <u>with</u> Plaintiff's Statement ¶¶ 107; 112-13.  However, these

disputes are not material to the case.  The types of adverse action the Second Circuit has indicated to be "material" for purposes of a disparate treatment claim are considerably more severe, taking the evidence in the light most favorable to Ucar, than those described with respect to the movement of Ucar's work location: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).  It is undisputed that Ucar's position, salary, and title stayed the same after the move, and that he was placed in location closer to his then-supervisor.  Defendant's Statement ¶ 105**.**  No reasonable juror could find that his move from one desk to another, even under the circumstances that Ucar's evidence describes, could constitute an adverse action as consequential and severe as the case law requires, at least for purposes of a claim for disparate treatment.

C.    Retaliation

Claims for retaliation under Title VII are analyzed under the McDonnell Douglas framework at the summary judgment stage.  Kwan, 737 F.3d at 844.  Under that framework, a plaintiff must first establish a prima facie case by showing "1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action."  Id. (internal quotation marks and citations omitted).  This showing creates a presumption of retaliation, which the defendant may rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action."  Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015) (internal

quotation marks and citation omitted).  If the employer proffers such an explanation, "the presumption of retaliation dissipates and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action."  Id. (internal quotation marks omitted) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)).  Proving that the complaints were a but-for cause of the adverse employment action is tantamount to proving that the defendants' stated, non-retaliatory reasons were merely pretext for unlawful retaliation.  Kwan, 737 F.3d at 846.

The court is persuaded that Ucar has put forward sufficient evidence upon which a reasonable juror could conclude that the first of these above elements has been established.  Ucar indisputably made complaints concerning conduct he believed was prohibited by Title VII to Human Resources on April 23, 2013, as well as later in June of that year.  A reasonable juror could find that a reasonable person would have concluded in good faith that the actions as to which Ucar complained—namely, the gym use investigation—were motivated by his national origin or religion.  See, e.g., Kelly v. Howard I. Shapiro & Assoc. Consulting Engineers, P.C., 716 F.3d 10, 16-17 (2d Cir. 2013) ("[M]ere subjective good faith belief is insufficient; the belief must be reasonable and characterized by objective good faith.  The objective reasonableness of a complaint is to be evaluated from the perspective of a reasonable similarly situated person." (internal quotation marks and citations omitted)).  Here, Ucar certainly believed he was being discriminated against and, though the court considers it a close question, a reasonable juror could find that a reasonable person would have had a good faith belief he was being discriminated against under the circumstances, particularly in light of the hostilities Ucar allegedly encountered at the DOT, coupled with the fact that, to a

reasonable person, it could well have appeared that he was being treated differently on account of his ethnicity or religion (even if evidence does not exist upon which a reasonable juror could draw that conclusion legally for purposes of a claim for disparate treatment, see supra at 24).

In any event, the parties did not raise the objective reasonableness of Ucar's belief that he had been discriminated against, and the court will turn to the other elements of his retaliation claims.  The second element of his prima facie case is certainly met: "general corporate knowledge" of these complaints is sufficient to sustain Ucar's burden of proving knowledge of that protected activity.  Id. at 844-45.  As detailed below, however, only two bases of his retaliation claim survive.

> 1.   5-Day Suspension

Ucar claims that the 5-day suspension, which was imposed August 30, 2013, was imposed in retaliation for his having filed complaints of discrimination.  Complaint at 11.  However, the DOT had commenced proceedings leading to that suspension well in advance of his complaints, having recommended a 60-day suspension on March 18, 2013.  The Supreme Court has held that "[e]mployers need not suspend previously planned [adverse employment actions] upon discovering that [protected activity has been engaged in], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (per curiam).  There thus is no basis on which a reasonable juror could conclude that there existed a causal connection between Ucar's complaints in April and June and a 5-day suspension that served as the

culmination of disciplinary proceedings that were contemplated as early as March.  The

5-day suspension cannot serve as a basis of Ucar's prima facie case of retaliation.

> 2.   Relocation of Ucar's Desk

Ucar alleges that the relocation of his desk was an adverse employment action

caused by the defendants' retaliatory motive.  Complaint at 10.  The court considers it a

close question whether this act constituted an adverse employment action within the

meaning of Title VII's anti-retaliation provision, but concludes that a reasonable juror

could find that it does.  The Second Circuit has explained that, for an employment action

to be materially adverse for purposes of retaliation, it must be "harmful to the point that

[it] could well dissuade a reasonable worker from making or supporting a charge of

discrimination."  Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).  The parties are in

dispute as to how severe the relocation in this case was: the defendants contend that

the new office was largely the same, while Ucar contends that the new office was

substantially more isolated and that the move was accompanied by prohibitions on

communication with his coworkers.  Courts in this Circuit have held that relocations that

make it harder to do one's job may be sufficiently adverse to make out a cause of action

under Title VII retaliation law, Lorenzo v. St. Luke's-Roosevelt Hosp. Ctr., 837 F. Supp.

2d 53, 69 (E.D.N.Y. 2011).  Therefore the court is reluctant to hold that no reasonable

juror could find that the relocation as described by Ucar in his Affidavit would have been

unable to "dissuade a reasonable worker from making or supporting a charge of

discrimination," Hicks, 593 F.3d at 165, and does not so hold.

Further, the temporal proximity of his move to his initial April complaint (one

week) is enough to establish prima facie causality.  However, the defendants have put

forward a legitimate business reason for the action: namely, reducing the rising tensions between Ucar and his co-workers concerning the aftermath of the gym use investigation.

However, the evidence of record would be a sufficient basis upon which a juror could reasonably conclude that the proffered legitimate basis is a pretext.  In addition to the aforementioned temporal proximity, the record reflects evidence upon which a juror could find that the complaints made by his coworkers concerning Ucar's "bullying" were minimal, nonthreatening, and even trivial.  A reasonable juror could conclude that Ucar's complaints—and not his "glances" at his coworkers—were the real reason for his relocation.  Accordingly, the court denies the defendants' Motion with respect to Ucar's retaliation claim concerning the relocation of his desk.

3.   Service of Negative Performance Evaluation

Ucar claims that the individual defendants' service of a negative performance evaluation in the absence of union representation, and in what Ucar considered a threatening manner, constituted retaliation.  Complaint at 11.  The court is unable to conclude that there is evidence upon which a jury could reasonably find that this event constituted adverse employment action within the meaning of Title VII retaliation law. Title VII "does not set forth a general civility code for the American workplace.  Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation.  Thus, the antiretaliation provision protects an individual not from all retaliation but from retaliation that produces an injury or harm."  Hicks, 593 F.3d at 165.  That his superiors asked him to stay later to receive a performance evaluation, and may have become angry with him when he refused,

simply is not sufficiently materially adverse to give rise to a cause of action under Title VII.  Consequently, this claim may not serve as a basis for Ucar's claim of retaliation.

     4. <u>Negative Performance Evaluation</u>

  This leaves Ucar's negative performance evaluation of September 12, 2013, as the final adverse action upon which Ucar's claim may be founded.  Complaint at 11. First, a negative performance evaluation could be found by a reasonable juror to be sufficient "to dissuade a reasonable worker from making or supporting a charge of discrimination."  <u>Hicks</u>, 593 F.3d at 165.  Second, Ucar has made out the other elements of his prima facie case with respect to the performance evaluation, including a causal connection: the evaluation was issued three months after the complaints were made.  <u>See</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]e have held that five months is not too long to find the causal relationship.").

  Finally, there exists evidence in the record upon which a juror could reasonably find that his complaints were the but-for cause of the negative evaluation, notwithstanding the legitimate, non-retaliatory reasons the defendants have proffered. <u>Nassar</u>, 133 S. Ct. at 2533 (2013).  First, as discussed above, the evaluation was issued as few as three months after Ucar's April and June complaints.  Second, as discussed below, there exists evidence on which a juror could conclude that the gym fact-finding and other performance deficiencies described in the evaluation were not the real reasons for the negative evaluation, and were in fact pretext.  Consequently, the court denies summary judgment as to this basis of Ucar's retaliation claim.

  Among the evidence submitted to counter the factual basis of the intensively negative 2012-2013 performance evaluation is an affidavit from a Transportation

Engineer 3 named Michael Lynch ("Lynch").  This affidavit was submitted in an effort to show that the negative performance evaluation is false and Ucar asks the court to infer thereby that the evaluation was caused by a retaliatory motive.  Affidavit of Michael Lynch (Doc. No. 79).  That Affidavit indicates that Lynch worked with Ucar for three months during the evaluation period.  Id. ¶ 6.  Lynch avers that he "was shocked at [the] negativity and harsh tone [of the performance review] because [his] experience working with Mr. Ucar was very different and very positive."  Id. ¶ 10.  Ucar also puts forward an affidavit from his union representative, Timothy McGuane ("McGuane"), to the effect that the gym investigation was "totally ridiculous," that the resulting sanction was disproportionate, and that the resulting negative performance evaluation notably "dramatic" in its downturn from previous evaluations.  Affidavit of Timothy McGuane (Doc. No. 77) ¶¶ 14, 27, 41.

    The defendants ask the court to disregard Lynch's affidavit for a number of reasons; the most salient of these are that Lynch was not Ucar's supervisor, worked in a different unit, worked with Ucar on only one project that was addressed in the evaluation, and that, ultimately, "it is undisputed that plaintiff's violation of [the prohibition on use of the gym while on the clock for federal projects] and suspension was grounds for an unsatisfactory performance appraisal."  Defendants' Reply at 16. The defendants also ask the court to disregard McGuane's Affidavit on the grounds, inter alia, that it consists largely of "unsupported opinions and beliefs" and that Ucar's previous evaluations were less than satisfactory, such that the 2013 evaluation was not as "dramatic" a downturn as McGuane claims.  Id. at 15-16.

The court disagrees.  The objections raised by the defendants are appropriate areas for cross-examination, not appropriate bases for summary judgment.  The temporal proximity of Ucar's complaints and the poor performance review, the apparent hostility exhibited by his superiors toward Ucar, the conflicting accounts of his performance, and the possibility that, generally speaking, the performance review rating was abnormal and out of line with past practice, are all grounds on which a reasonable juror could conclude that, but for his complaints, Ucar would not have been issued a negative performance review.  There exist then, genuine disputes of material fact as to this basis of Ucar's retaliation claim.  The court accordingly denies the defendants' Motion as to that claim.

D.     Remaining Claims

Ucar's claims under section 1983 of title 42 of the United States Code rise and fall with his Title VII claims.  Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). Summary judgment is accordingly granted as to these section 1983 claims that coincide with the Title VII claims as to which summary judgment has been granted to the defendants by this Ruling, but denied as to those section 1983 claims that coincide with the grounds for disparate treatment and retaliation discussed above.  See Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (section 1983 and Title VII claims are parallel except insofar as section 1983 claims can be made against individuals); Giscombe v. New York City Dept. of Educ., 39 F. Supp. 3d 396, 404-06 (S.D.N.Y. 2014) (Title VII and section 1983 claims are "identical").

The defendants have raised statutory and qualified immunity with respect to Ucar's section 1983 claims.  See Defendants' Memorandum at 43-47.  Neither defense

applies.  With respect to statutory immunity, the defendants rely upon section 4-165 of

the Connecticut General Statutes, which immunizes state employees from liability

sounding in negligence falling within the scope of their employment.  Conn. Gen. Stat.

§ 4-165.  As the foregoing discussion of the retaliation claims that survive in this case

illustrates, the court has concluded that a reasonable juror could find that the

defendants' imposed adverse employment actions against Ucar in retaliation for

complaining about discrimination.  See supra at 28-29; 30-32.  The conduct alleged is

not negligent, but rather at least "reckless" if not intentional, which is not immunized by

statute.

　　　　With regard to qualified immunity, the defendants do not appear to have

expressly argued qualified immunity as to the retaliation claims, reserving their single

line of argument concerning qualified immunity to Ucar's claims for disparate treatment.

Defendants' Memorandum at 47 ("[T]he plaintiff has offered nothing more than his own

speculation that other similarly situated employees were treated differently to support

his Section 1983 claims.").  Their argument with regard to disparate treatment

disregards the affidavits submitted by Ucar and fails to account for the discriminatory

statements made at the bullying investigation.  Moreover, to the extent that this

inadequate argument is raised with respect to Ucar's claim for section 1983 retaliation,

the court is unpersuaded.  Qualified immunity is an immunity from suit that applies

where a state actor's "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982); see also Lane v. Franks, 134 S. Ct. 2369, 2381

(2014) (same).  The right to be free from adverse employment action on account of

being a member of a protected class or on account of filing a good faith complaint of

such discrimination has been the law for many years, and a reasonable person would

have known of it.  See, e.g., Kercado-Clymer v. City of Amsterdam, 370 Fed. App'x 238,

243 (2d Cir. 2010) (Title VII's prohibition against taking adverse employment action in

retaliation for engaging in protected activity is "clearly established").  Furthermore, a

reasonable juror could conclude based on the evidence of record that, in light of the law

that existed at the time, the defendants' conduct was objectively unreasonable.  See

Green v. City of New York, 465 F.3d 65, 83 (2d Cir. 2006) ("If there is a material

question of fact as to the relevant surrounding circumstances, the question of objective

reasonableness is for the jury.").  For these reasons, the court declines to apply

qualified immunity as to the discrete retaliation claims that survived the defendants'

Motion for Summary Judgment.

Finally, the court grants the defendants' Motion as to Ucar's claims for Intentional

Infliction of Emotional Distress.  The elements of that cause of action in Connecticut are

well-established: "(1) that the actor intended to inflict emotional distress; or that he knew

or should have known that emotional distress was a likely result of his conduct; (2) that

the conduct was extreme and outrageous; (3) that the defendant's conduct was the

cause of the plaintiff's distress and (4) that the emotional distress sustained by the

plaintiff was severe."  Petyan v. Ellis, 200 Conn. 243, 253-54 (1986).  The question

whether conduct is "extreme and outrageous" is a question of law to be resolved by the

court.  See, e.g., id. at 255.  Such conduct "exceeds all bounds usually tolerated by

decent society and is so outrageous in character, so extreme in degree, and is

calculated to cause, and does cause, mental distress of a very serious kind." Appleton v. Bd. of Educ., 254 Conn. 205, 210 (2000).

The court cannot conclude that the maltreatment to which Ucar claims he was subjected arises to the requisite threshold described by the Supreme Court of Connecticut.  As another judge in this district has explained in language that could readily have been written about the instant case, "[c]lose supervision, the demeaning and unprofessional speech alleged by the plaintiff, unfair job appraisals, inferior office space, denial of pay raises and promotions, orders to limit interactions with certain employees, . . . discrimination on the basis of race and/or national origin, and/or retaliating against an employee for complaining about such discrimination, do not meet the standard for finding that conduct was extreme and outrageous." Lorenzi v. Conn. Judicial Branch, 620 F. Supp. 2d 348, 353 (D. Conn. 2009) (Thompson, J.) (citing White v. Martin, 23 F. Supp. 2d 203, 208 (D. Conn. 1998), aff'd, 198 F.3d 235 (2d Cir. 1999) (gender discrimination and denial of promotion, discipline, and harassment, not "extreme and outrageous")).  Consequently, the defendants' Motion is granted as to this claim.

## V.    CONCLUSION

For the reasons set forth above, the defendants' Motion for Summary Judgment (Doc. No. 63) is **GRANTED IN PART** and **DENIED IN PART**.  In particular, the defendants' Motion is granted, except with regard to the claims for disparate treatment related to Ucar's 5-day suspension and the claims for retaliation related to the relocation of Ucar's desk and the issuance of the negative 2012-2013 performance appraisal, as to which claims the Motion is denied.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 11th day of August, 2016.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge